## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DENISE HAYES,

     Plaintiff,

     v.

ADVOCATE HEALTH CARE
NETWORK,

     Defendant.

No. 19-cv-06071

Judge John F. Kness

## MEMORANDUM OPINION & ORDER

Defendant Advocate Health Care Network fired Plaintiff Denise Hayes, a sleep-study technician, after she incorrectly administered a sleep study and falsified a patient's medical chart. Plaintiff, who was 58 years old at the time she was fired, alleges that Defendant's stated reasons for terminating Plaintiff's employment were but a pretext for unlawful age discrimination. Defendant now moves for summary judgment (Dkt. 57) and contends that Plaintiff's case fails as a matter of law.

As explained below, Defendant is entitled to summary judgment in its favor. Plaintiff cannot identify a suitable, younger comparator who was disciplined less severely. Nor does the record support Plaintiff's contentions that she was treated worse than younger sleep techs, that Defendant conducted a sham investigation, or even that Plaintiff was replaced by a younger sleep tech. Plaintiff thus cannot demonstrate that she was terminated because of her age. Accordingly, the Court

grants Defendant's motion for summary judgment.

## I.    BACKGROUND

Beginning in 2008, Plaintiff Denise Hayes worked as a registered polysomnography technician (a "sleep tech") at Defendant Advocate Health Care Network's Tinley Park West facility ("Tinley West"). (Dkt. 70 ¶¶ 6, 8, 10, 11.) Plaintiff administered sleep studies that test patients for various sleep disorders. (*Id.* ¶ 12.) Sleep studies have two parts: a diagnostic component, which monitors patients for sleep apnea as they sleep through the night, and a multiple sleep latency test ("MSLT"), where the sleep tech runs a series of 15- to 20- minute patient naps to determine if the patient has narcolepsy. (*Id.* ¶ 13.) An overnight diagnostic test always precedes a MSLT. (*Id.* ¶ 14.) Throughout her career, Plaintiff administered thousands of sleep tests, including about 50 MSLTs. (*Id.* ¶ 15.)

Plaintiff was required to follow the physicians' orders when administering sleep studies but could not force a patient to stay for a sleep test even if prescribed by a doctor. (*Id.* ¶¶ 18–19, 21.) Plaintiff was also required to accurately document the sleep study in the patient's medical chart, including the patient's refusal to take an ordered sleep test.[1] (*Id.* ¶ 39.)

---

[1] If a patient leaves a sleep test early, the general practice, according to two of Defendant's employees, was to require the patient to execute an against medical advice ("AMA") form. (*Id.* ¶ 22; Dkt. 59-5 at 15 [Pierce Deposition]; Dkt. 59-9 at 9 [Breheny Deposition].) Plaintiff, however, testified that she was unaware of any AMA form and that she would document in a patient's medical chart that patient's decision to terminate a sleep test early. (Dkt. 70-1 at 19.)

In 2018, Dr. Robert Aronson issued a written order for Patient A[2] to undergo a diagnostic sleep study followed by an MSLT at Tinley West. (*Id.* ¶ 26.) Dr. Aronson's order specified the conditions under which Patient A's MSLT could be cancelled: "Cancel MSLT if AHI (apnea hypopnea index) ≥ (greater than or equal to) 15." (*Id.* ¶ 27.) Patient A's diagnostic sleep test was scheduled overnight on October 16, 2018, with the MSLT to immediately follow the next morning on October 17, 2018. (*Id.* ¶ 28.) There was, however, a notation in Patient A's medical chart entered on October 15, 2018, which stated that Patient A had "court" on October 17 and was thus "banking on cancelling the MSLT due to positive test." (Dkt. 68-15 at 3.)

When Plaintiff arrived at Tinley West on the morning of October 17, she reviewed Dr. Aronson's order and understood that Patient A's MSLT was to be cancelled only if Patient A's AHI value was at least 15. (Dkt. 70 ¶ 31.) The night shift sleep tech told Plaintiff that Patient A's AHI was only 9 and Plaintiff confirmed this value on the computer, meaning Patient A's MSLT should not have been canceled per Dr. Aronson's order. (*Id.* ¶ 32.) Plaintiff then entered Patient A's sleeping room as Patient A was waking up and had the following recorded exchange with Patient A:

> PLAINTIFF: Okay. We're going to get you up now. We're going to put you in bed and do those fun little exercises. And once the exercises are done, we'll get you up. And then you're staying for the second portion, correct?
>
> PATIENT A: Unh-unh.
>
> PLAINTIFF: No? You don't want to stay for the second portion?

---

[2] To protect the privacy of the patient involved in this case, the parties and this opinion refer to the patient as Patient A.

PATIENT A: Do I need to?

PLAINTIFF: You have apnea, so, yeah. The doctor said –

PATIENT A: The doctor, he said if I had apnea, I didn't need the second portion.

PLAINTIFF: Oh, he did say that?

PATIENT A: Yes.

PLAINTIFF: Okay. Because what he told us is if you stop breathing 15 times an hour, to do the second half. But if you didn't stop breathing 15. It was a little less. So it's up to you if you want to stay or not.

PATIENT A: No. I don't want to do the second part. I already know I have apnea.

PLAINTIFF: Okay. All right.

(*Id.* ¶ 33.) Plaintiff admitted at her deposition that she "made a mistake" in advising Patient A. (*Id.* ¶ 34.) Plaintiff told Patient A that the MSLT was unnecessary because Patient A's AHI was under 15 when Dr. Aronson's order required the opposite. (*Id.*) Patient A then left Tinley West without undergoing the MSLT. (*Id.* ¶ 37.) In Patient A's medical chart, Plaintiff wrote, "Patient decided not to do the MSLT." (*Id.* ¶ 38.) Plaintiff, however, did not include the erroneous advice she gave Patient A regarding Dr. Aronson's order. (*Id.*)

Later that morning, Plaintiff told Jessica Johns, a sleep tech whom Plaintiff was training that day, that Patient A "was sent home due to having apnea." (Dkt. 62-14 at 4.) Johns "was concerned" because Plaintiff's explanation for why Patient A forwent the MSLT "versus what [Plaintiff] put in the chart were two different things." (*Id.*) Johns reported her concerns to lead sleep tech Janelle Breheny, who reviewed Patient A's medical chart, Dr. Aronson's order, and the results of the diagnostic sleep

study, and determined that "it didn't match up." (Dkt. 62-12 at 4.) Breheny escalated the matter to Sleep Center Manager Daniel Pierce. (Dkt. 70 ¶¶ 4, 43.) Pierce instructed Breheny to call Patient A to determine what happened, and Breheny and Patient A spoke on the phone twice that day. (*Id.* ¶¶ 44–46.) Breheny sent Pierce an email documenting the conversation, writing that Patient A said that Plaintiff:

> Stated [Patient A] didn't have to stay . . . there was no need for [Patient A] to stay because [Patient A] was diagnosed with sleep apnea . . . [Patient A] then stated [that Patient A] was aware of the doctors order and would have stayed if . . . told [that Patient A] still needed to, even though [Patient A] really didn't want to be here all day.

(*Id.* ¶ 48.)

Based upon Breheny's email, Pierce concluded that Plaintiff falsified Patient A's chart by not including "that she gave [Patient A] bad information that led" to Patient A declining the MSLT. (*Id.* ¶ 54.) Pierce alerted his boss, Director of System Sleep Services Angela Marczali, about the situation. (*Id.* ¶ 49.) Marczali understood, based on Pierce and Breheny's investigation, that Patient A would have stayed for the MSLT had Plaintiff advised Patient A correctly about Dr. Aronson's order. (*Id.* ¶ 55.) Pierce also informed Human Resources (HR) Representative Jennifer Schneider regarding his concerns and wrote via email that, "Historically we have terminated staff for falsifying medical records and this situation appears to qualify." (*Id.* ¶ 50.) For example, in 2012, Marczali, with HR's approval, terminated an employee for falsifying a patient record. (*Id.* ¶ 51.) Schneider recommended that Pierce and Marczali maintain precedent of terminating staff for record falsification. (*Id.* 56.) Marczali thus decided, after conferring with Pierce and Schneider, to terminate

5

Plaintiff's employment for falsification of a patient record.[3]

Marczali fired Plaintiff on October 23, 2018, after Plaintiff returned from a scheduled vacation. (*Id.* ¶ 58.) Plaintiff formally appealed her termination through Defendant's Conflict Resolution process and requested access to the recording of her conversation with Patient A (the "Recording"). (*Id.* ¶ 61.) On November 16, 2018, Pierce and Marczali reviewed the Recording and, according to Pierce, "it only confirmed our suspicions and we felt like we made the right choice."[4] (*Id.* ¶ 62.) Schneider, Marczali, and Pierce held a Conflict Resolution phone conference with Plaintiff on November 20, 2018. (*Id.* ¶ 64.) At the conference, Plaintiff asked for her job back and proof regarding Plaintiff's record falsification. (*Id.* ¶ 64.) Following the conference, Marczali sent Plaintiff a letter confirming the decision "to uphold your termination for failure to follow direct orders and falsification of records" and that Defendant could not release the Recording without court order. (*Id.* ¶ 66.) Plaintiff was 58 years old when she was fired.

Plaintiff then filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on age. (Dkt. 1 ¶ 6; Dkt. 1-1 at 2.) The EEOC issued a Notice of Right to Sue letter, and Plaintiff filed suit on September 10, 2019. (Dkt. 1.) Plaintiff's complaint

---

[3] According to Plaintiff, there is a disputed fact regarding whether Marczali and Pierce had authority to fire Plaintiff without HR's approval. (Dkt. 69 at 5.) Any dispute on this fact, however, is immaterial to whether Plaintiff was fired because of her age.

[4] Neither Marczali nor Pierce reviewed the Recording before terminating Plaintiff. (*Id.* ¶ 63.) Marczali did not review the Recording because she did not think of it, and Pierce testified that he did not review the Recording because he was unaware that the Recording would have any useful audio. (*Id.*)

asserts one count of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (*Id.* ¶ 1.) Defendant then moved for summary judgment (Dkt. 57).

In opposing summary judgment, Plaintiff alleges that Defendant, in the months before Plaintiff's termination, "commenced a campaign designed to rid Defendant's workplace of Plaintiff, who would have become the oldest Sleep Tech at Tinley West" after an older sleep tech's retirement in December 2018. (Dkt. 69 at 4.) This "campaign" consisted of making Plaintiff train the substantially younger sleep tech Jessica Johns (age 32) and asking Plaintiff to work the night shift, which Plaintiff alleges "takes a significant physical and emotional toll on individuals." (*Id.* at 2, 4, 15.)

According to Plaintiff, Defendant then concocted pretextual reasons—disobeying Dr. Aronson's order and falsifying patient records—for terminating Plaintiff. Plaintiff argues that Patient A, not Plaintiff, decided to forgo the MSLT, which is evidenced by the notation in Patient A's chart that Patient A was "banking on cancelling the MSLT due to positive test," and "Patient A unambiguously express[ing] to plaintiff at the commencement of their interaction on October 17, 2018, that she did not wish to stay for the MSLT." (*Id.* at 5–6; Dkt. 68-15 at 3.) Plaintiff's entry in Patient A's medical chart that "the patient chose to leave and to not do the MSLT" was thus a true statement. (Dkt. 69 at 6.) And Pierce's contention that Plaintiff failed to "include [on Patient A's medical chart] that she gave [Patient A] bad information that led to that choice" is irrelevant because "Patient A's decision

not to proceed with the . . . MSLT would not have changed" regardless of the information Plaintiff provided, and sleep techs are required to summarize the "outcome of the test," not "specify in detail their communication(s) with the particular patient." (*Id.* at 7–8.) Moreover, Plaintiff did not disobey Dr. Aronson's order because Plaintiff could not force Patient A to undergo the MSLT. (*Id.*)

Plaintiff also contends that Defendants' investigation into the aborted MSLT provides further evidence of pretext. Before terminating Plaintiff, Defendant's management did not ask Plaintiff any questions regarding the aborted MSLT and did not review the Recording of Plaintiff and Patient A's conversation in the sleep study room. (Dkt. 69 10–11; Dkt. 76 ¶¶ 95, 100.) Marczali also decided to fire Plaintiff based on Pierce and Breheny's investigation notes which, according to Plaintiff, were contrived: Breheny sent Pierce an email inquiring, "you like this" after revising the notes, showing that Pierce asked Breheny to tailor her notes to support Plaintiff's termination. (Dkt. 69 at 11–12.)

Finally, Plaintiff contends that 32-year-old Johns temporarily assumed Plaintiff's duties for two months until 60-year-old Hernando Jaramillo was hired to fill Plaintiff's position full time; this, Plaintiff says, is further evidence of pretext. (Dkt. 69 at 8–9.; Dkt. 76 ¶ 93.) Plaintiff further contends that Jaramillo was only placed at Tinley West to "buttress [Defendant's] pretextual reasons for terminating Plaintiff," as Jaramillo worked at Tinley West for only two months before he resumed his prior position at a different Defendant facility and was replaced by Sarah Rizzo, a sleep tech in her late 20s. (Dkt. 69 at 8–9.)

## II.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.    DISCUSSION

Under the ADEA, workers "who are forty years old and older" are protected from "discrimination based on age." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). Employers are prohibited from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 960 (7th Cir. 2021). To prevail on an ADEA claim, a plaintiff must prove that "age was the 'but for' cause of the allegedly discriminatory employment action." *Id.* There are two "analytical approaches" for determining causation under the ADEA: (1) the *McDonnell Douglas* burden-shifting framework[5] and (2) the holistic evidence framework. *See id.* Plaintiff addresses both frameworks.

---

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### a. *McDonnell Douglas* **Burden-Shifting Framework**

Under the burden-shifting framework, a plaintiff must first establish a prima face case of age discrimination by demonstrating that "(1) she is . . . protected under the ADEA . . . ; (2) she performed her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment." *Brooks*, 39 F.4th at 434. If the plaintiff establishes a prima facie case, then the defendant must provide "legitimate, nondiscriminatory reasons" for terminating the plaintiff, at which point the burden shifts back to the plaintiff to "demonstrate that [the defendant's] reason is pretextual—that is, an attempt to mask a discriminatory reason with a legitimate excuse." *Id.*

It is undisputed that Plaintiff can prove the first three prongs of her prima facie case: Plaintiff was 58 years old when she was fired, she consistently received "significantly exceeds expectations" or "exceeds expectations" performance ratings (Dkt. 70 ¶ 23, 75), and she suffered an adverse action when she was terminated. (*See* Dkt. 61 at 7; Dkt. 69 at 4–5.) Plaintiff, however, argues for a modified version of prong four where, instead of identifying a similarly situated employee outside the protected class who received better treatment, Plaintiff must show that her "duties were absorbed by employees not in the protected class." (Dkt. 61 at 3–4 (citing *Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1217 (N.D. Ill. 2017)).)

Plaintiff's proffered standard is only applicable when the "ADEA plaintiff has been laid off as part of a mini-[reduction-in-force]" ("mini-RIF"). *Brown*, 246 F. Supp.

3d at 1217. In a "mini-RIF," a "single employee is discharged and his position is not filled." *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). Instead, the "discharged employee's duties are absorbed by other existing staff." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 689 (7th Cir. 2006). Mini-RIF cases are distinct from "single-discharge cases based on misconduct," where an employee is terminated but the company retains the position and fills it with a new employee. *See Vonckx v. Allstate Ins. Co.*, 2004 WL 1427105, at *9–10 (N.D. Ill. June 23, 2004). In single-discharge cases, the similarly-situated standard is applied at prong four. *Id.*; *see also Allen v. Fort Wayne Foundry Corp.*, 614 F. Supp. 2d 943, 953 (N.D. Ind. 2009) (mini-RIF "framework seems questionable" because plaintiff "was fired for cause," and plaintiff was "completely replaced" by new employee).

This case involves a single-discharge based on misconduct, not a mini-RIF. Plaintiff was fired in October 2018. Beginning in January 2019, Hernando Jaramillo, and then Sarah Rizzo, filled Plaintiff's position full-time. Plaintiff's position was not eliminated, nor were her duties permanently absorbed by other existing employees. Although Plaintiff alleges that, until Jaramillo was hired, her responsibilities were temporarily assumed by 32-year-old Jessica Johns,[6] Defendant understandably did

---

[6] The record does not clearly support Plaintiff's allegation that Johns exclusively assumed Plaintiff's duties in the interim. For example, Pierce testified that Defendant "had to use the staff that we had in order to cover," including "Tina Alexander, LaToya Ringo, Cherry Brinson, and Jazzmine Jalomo." (Dkt. 68-2 at 39–40.) Pierce did not name Johns when explaining who covered for Plaintiff. And Johns's testimony is equivocal. When asked who assumed Plaintiff's duties, Johns testified, "I don't remember if it was where I stepped in or if it was when [Sarah Rizzo and Hernando Jaramillo] came on." (Dkt. 68-4 at 12.) In any event, because Plaintiff's position was not permanently eliminated, the mini-RIF standard is improper (even when the Court assumes, as Plaintiff alleges, that Plaintiffs' duties were assumed exclusively by Johns).

not have a candidate immediately ready to replace the fired Plaintiff. As a result, the mini-RIF standard is inapt here because Plaintiff's duties were temporarily, not permanently, assumed by a younger sleep tech. *See Allen*, 614 F. Supp. 2d at 953 (rejecting application of the mini-RIF framework because the younger, existing employee "only temporarily took over [plaintiff's] . . . duties"). Accordingly, the Court will apply the similarly-situated standard at prong four.

Similarly situated employees "need not be 'identical in every conceivable way,' [but] they 'must be directly comparable to the plaintiff in all material respects.' " *Marnocha v. St. Vincent Hospital and Health Center, Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). In misconduct cases, a plaintiff must show that she was disciplined more severely than the comparator employee despite committing the same infraction. *See Coleman*, 667 F.3d at 858 (plaintiff must show that "similarly situated employee had been disciplined less harshly").

Plaintiff has failed to identify a similarly situated employee who was disciplined comparatively less severely. Plaintiff admits that she "cannot identify any other [Defendant] employee who falsified a medical chart" or "countermanded a physician's order" and was not fired. (Dkt. 70 ¶ 71; Dkt 59-1 at 22–23.) It is also undisputed that Marczali fired an employee for falsifying a patient record in 2012. (Dkt. 70 ¶ 51.) Plaintiff's only asserted evidence on prong four is Johns's temporary assumption of Plaintiff's duties. (Dkt. 69 at 8–9.) But this fact is irrelevant (under the burden-shifting framework) because this is not a mini-RIF case. *Brown*, 246 F. Supp.

3d at 1217. Because Plaintiff does not supply any relevant evidence on prong four, she cannot establish a prima facie case of age discrimination. *Umberger v. City of Peoria, Ill.*, 2022 WL 193597, at *13 (C.D. Ill. Jan. 21, 2022) (Plaintiff "fails to address the fourth prong requiring him to identify someone who was similarly situated to him but treated more favorably. This failure alone is fatal."). Causation thus cannot be established under the burden-shifting framework.

### b. Holistic Evidence Framework

In contrast to the burden-shifting approach, the holistic evidence framework requires a court to determine whether all the relevant evidence "would permit a reasonable factfinder to conclude that the plaintiff's [age] . . . caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Relevant evidence includes smoking-gun evidence such as a defendant's "actual admission of discriminatory intent." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citing *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 775 (7th Cir. 2013)). Circumstantial evidence, such as evidence that the employer's stated reasons for terminating the plaintiff were pretextual, is also relevant. *See Coleman*, 667 F.3d at 852. All the "evidence belongs in a single pile and must be evaluated as a whole" to determine discriminatory intent. *Ortiz*, 834 F.3d at 766.

There is no smoking-gun evidence: Plaintiff admits that Defendant's managers never said anything derogatory to Plaintiff or any other employee about their age. (Dkt. 70 ¶ 72.) Plaintiff argues solely that Defendant's stated reasons for her termination—disobeying a doctor's order and falsifying a medical record—were

pretextual.

When assessing pretext, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). It is not a court's concern "that an employer may be wrong about its employee's performance[] or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason . . . was a lie." *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)). To show pretext, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's stated reasons "that a reasonable person could find it unworthy of credence." *Coleman*, 667 F.3d at 852–53 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). But the plaintiff must do more than show that the employer's stated reason was dishonest; there must also be evidence that "the employer's true reason was based on discriminatory intent." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008).

Plaintiff first asserts that, in the months before her termination, Defendant "commenced a campaign" to get rid of Plaintiff, who was slated to become the oldest sleep tech. As part of this "campaign," Defendant required Plaintiff to train sleep tech Johns, who was 32, and asked Plaintiff to work the night shift. (Dkt. 69 at 2, 4, 15.) Plaintiff's intended inference is that Defendant was already planning to fire Plaintiff before the aborted MSLT and needed a pretextual reason to mask Defendant's

14

discriminatory intent. This proffered inference, however, is not tenable under the relevant and available evidence.

An employer does not evince discriminatory intent simply by asking an older, experienced employee to train a younger, inexperienced employee. *See Leibforth v. Belvidere Nat. Bank*, 2002 WL 1760220, at *3 (N.D. Ill. July 30, 2002) (employer did not discriminate by directing an older employee, who was subsequently terminated, to train younger employer). There must also be evidence that the employer "intended to replace [the older employee] with a younger person and then succeeded in doing so." *See Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995). Because Defendant ultimately hired the 60-year-old Jaramillo, not Johns, as Plaintiff's replacement, the Court cannot infer from the record evidence that Plaintiff's termination was preplanned.

Plaintiff also complains that she was treated less favorably than her younger colleagues because, "despite her seniority," she was assigned to the undesirable night shift when the younger sleep techs, Breheny and Johns, were not. (*See* Dkt. 69 at 4–5 (Plaintiff arguing that the night shift "takes a significant physical and emotional toll on individuals.").) Plaintiff's contention, however, is not supported by the evidence of record (not even Plaintiff's deposition testimony).[7] *See Wilcox v. Allstate Corp.*, 2012

---

[7] Deposition testimony from other sleep techs undercuts Plaintiff's claim that the night shift is less desirable: those witnesses testified that night and day shifts are materially different, night shifts receive greater pay, and some sleep techs prefer the night shift. (Dkt. 70-5 at 10; Dkt. 70-9 at 9; Dkt 70 ¶¶ 9, 107–08.) For example, sleep techs Breheny and LaToya Ringo testified that day shifts consist mostly of "scheduling and ordering" and calling "patients and physician offices," while night shifts involve "direct patient care." (Dkt. 70-5 at 10; Dkt. 70-9 at 9.) Ringo and Cherry Brinson preferred night shifts, but Jaramillo testified that he was not "a night shift person." (Dkt. 70 ¶ 107–08.)

WL 6569729, at *6 (N.D. Ill. Dec. 17, 2012) (An "assertion of fact requires a citation to specific support in the record; an unsubstantiated [assertion] is not adequate."). In short, the record does not support Plaintiff's contention that there was a premeditated "campaign" to fire Plaintiff because of her age.

Nor does the record support Plaintiff's principal argument that she was not at fault for Patient A's aborted MSLT. According to Plaintiff, she did not disobey Dr. Aronson's order nor falsify Patient A's medical record because Patient A decided to forgo the MSLT and Plaintiff could not force Patient A to take the test. Plaintiff points to the notation in Patient A's chart made two days before the sleep study, which says that Patient A was "banking on cancelling the MSLT *due to positive test*." (Dkt. 68-15 at 3 (emphasis added).) This supposedly shows that Patient A had already decided against taking the MSLT before the sleep study. But the note conditions cancellation on a "positive test," defined in Dr. Aronson's order as having an AHI of at least 15. Patient A's AHI was nine, so Plaintiff should have informed Patient A that the test was negative and the MSLT was required. Plaintiff told Patient A the opposite.

Plaintiff contends that her mistake was immaterial. According to Plaintiff, because "at the commencement of [Patient A's] interaction with Plaintiff, Patient A unequivocally states that she is not staying for the MSLT," Patient A's decision "would not have changed regardless of any information Plaintiff may or may not have provided." (Dkt. 69 at 7.) The transcript of the Recording, however, shows that Patient A makes no such statement. When Plaintiff woke Patient A and asked Patient A whether she was staying for the MSLT, Patient A unintelligibly responded

"Unh-unh." (Dkt. 70 ¶ 33.) Plaintiff then asked, "No? You don't want to stay for the second portion?" and Patient A responded, "Do I need to?" (*Id.*) This is not an "unequivocal" statement of Patient A's intent to forgo the MSLT. On the contrary, it shows that Patient A's decision depended on Plaintiff's advice. Because Patient A's decision was premised on "bad information that led to that choice," Pierce thus correctly faulted Plaintiff for charting that Patient A "chose to leave and to not do the MSLT."[8] (Dkt. 62-9 at 5.)

Even if Pierce and Marczali were mistaken regarding Plaintiff's misconduct (they were not), that would not by itself establish pretext; Plaintiff would still have to show that Pierce and Marczali did not genuinely believe Plaintiff committed the misconduct when terminating her employment. *See Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999) (The question in an ADEA case is the employer's "state of mind at the time the decision to terminate [employee] was made."). According to Plaintiff, Pierce and Marczali's mendacity is evident from their inadequate investigation into the aborted MSLT.

A "sham" investigation may be evidence of pretext when the "persons conducting the investigation fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome." *Harden v.*

---

[8] Plaintiff contends that she was not required to chart the "bad information" she provided to Plaintiff because sleep techs must summarize the "outcome of the test," not "specify in detail their communication(s) with the particular patient." (Dkt. 69 at 7–8.) Plaintiff relies on deposition testimony from sleep techs Brinson and Ringo for this proposition. But Brinson and Ringo both testified that they record their communications with patients if the patients "were reluctant to have the study" or "if it's been a difficult encounter." (Dkt. 70-8 at 9; Dkt. 70-9 at 11.) Because Patient A was reluctant to have the MSLT, Plaintiff, based on the testimony she cites, should have recorded her communications in Patient A's medical chart.

*Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). Defendant's investigation, however, was no sham. It began when Johns was concerned that Patient A's chart and Plaintiff's explanation regarding the MSLT were inconsistent. (Dkt. 62-14 at 4.) Breheny then reviewed Patient A's chart and agreed that the sleep study results and aborted MSLT "didn't match up." (Dkt. 62-12 at 4.) Breheny, at Pierce's instruction, contacted Patient A and confirmed that Plaintiff erred.[9] (Dkt. 70 ¶¶ 4, 43–46, 48.) Pierce and Marczali then conferred with HR and decided, based on the forgoing investigation, to fire Plaintiff. This investigation, consisting of four Defendant employees reviewing Patient A's medical chart and Breheny interviewing Patient A, provided Defendant with a sufficient basis to terminate Plaintiff. Moreover, that sleep techs Johns and Breheny, not management, spurred the investigation weakens Plaintiff's allegation that her misconduct was camouflage for discrimination.

Plaintiff argues that Pierce and Marczali ignored available exculpatory evidence during their investigation. For instance, Pierce and Marczali, before

---

[9] Breheny wrote, "you like this" at the top of an email she sent to Pierce documenting her conversation with Patient A. (Dkt. 76 ¶ 98.) Breheny and Pierce both testified that they were unsure what "you like this" meant. (Dkt. 70-2 at 27-28; Dkt. 70-5 at 22.) According to Plaintiff, "you like this" was in reference to Breheny's "latest revisions," which shows that "Pierce asked Breheny to tailor her notes documenting her communication with Patient A to support his decision to terminate Plaintiff." (Dkt. 69 at 14.) This inferential leap is not supported by the record. Breheny sent her first summary email with "you like this" to Pierce on October 18, 2018. (Dkt. 70-2 at 28.) Four days later, Pierce responded, "The items in quotation should reflect the exact words the patient used. These are written from a third person perspective. Can you revise these ASAP?" (Dkt. 70-16 at 5.) The record does not contain an additional revision. In any event, Pierce requested that Breheny alter the point of view, not the substance, of the summary. Plaintiff's contention that Breheny doctored her notes to support Pierce's termination is speculation that has no record support.

terminating Plaintiff's employment, did not solicit Plaintiff's side of the story. (Dkt. 69 at 11.) Although some employers, out of a sense of fairness, might have interviewed an employee in Plaintiff's position, Defendant's failure to do so here does not necessarily demonstrate a genuine factual issue concerning pretext. *See Carter v. Thompson Hotels*, 943 F. Supp. 2d 830, 842 (N.D. Ill. 2013); *Arive v. Essilor Lab'ys of Am., Inc.*, 2006 WL 839467, at *9 (S.D. Ind. Mar. 30, 2006). Nor would soliciting Plaintiff's account have revealed new information—Plaintiff admitted during her deposition that she "made a mistake" in advising Patient A regarding the MSLT. (Dkt. 62-5 at 7.) Plaintiff also faults Pierce and Marczali for not considering the note in Patient A's chart that she was "banking on cancelling the MSLT due to positive test" and not reviewing Plaintiff and Patient A's recorded conversation.[10] (Dkt. 69 at 11.) The note and Recording, however, confirm the legitimacy of Defendant's decision. The note states that Patient A would cancel if there was a "positive test," but the test

---

[10] Plaintiff contends that Pierce's stated reason for not reviewing the Recording is illogical. (Dkt. 69 at 10.) Pierce testified that he did not review the Recording because he was "unaware of the quality of the audio" and whether "it would have any value." (Dkt. 70-2 at 34.) But Pierce later testified that sleep tests are recorded to determine if the patient "sleep-talks" or "snores loudly," which suggests that Pierce knew the Recording might have useful audio. (*Id.*) Defendant maintains that Pierce's testimony was consistent because "Pierce, in testifying about the reasons for the audio recording, was relating his knowledge as at the time of his deposition, not the time of plaintiff's discharge." (Dkt. 74 at 10.) It is unclear whether Pierce acquired knowledge regarding the Recording's audio between the time of Plaintiff's termination and Pierce's deposition. Regardless, this minor inconsistency, without more, is not enough to "raise an inference of [Defendant's] general untruthfulness with respect to [Plaintiff's] termination." *Morris v. Jewel Food Stores, Inc.*, 2003 WL 21267091, at *6 (N.D. Ill. May 30, 2003) (To avoid summary judgment, plaintiff must at least present "minor discrepancies . . . buttressed by reasonable pro-[plaintiff] inferences.").

was negative,[11] and the Recording captures Plaintiff incorrectly advising Patient A that the MSLT was unnecessary.[12] This evidence, if reviewed, would only have reinforced Defendant's reasons for firing Plaintiff.

Finally, Plaintiff argues that her replacement by significantly younger sleep techs is evidence of pretext. This argument is unavailing. Generally, "the mere fact that a protected employee (one past his or her fortieth birthday) was replaced by an unprotected employee (someone not yet there) does not by itself create an inference of age discrimination." *Sprague v. Navistar Intern. Transp. Corp.*, 838 F. Supp. 1268, 1276 (N.D. Ill. 1993). But Plaintiff's problem is more fundamental: there is no dispute that 60-year-old Jaramillo filled Plaintiff's position full time.[13] Although 32-year-old Johns temporarily assumed Plaintiff's duties for two months until Jaramillo was

---

[11] Marczali testified that she would still have terminated Plaintiff even if she had reviewed the chart note that Patient A was "banking on cancelling the MSLT." (Dkt. 62-7 at 10.) This evidence is unrebutted.

[12] As further evidence of pretext, Plaintiff notes that Patient A, upon being contacted by Marczali during discovery, said that Plaintiff "should not have been fired." (Dkt. 69 at 13; Dkt. 76 ¶ 105.) Patient A's opinion is irrelevant to whether the investigation was a sham because the opinion was unknown to Defendant at the time Plaintiff was fired. In other words, Defendant could not have ignored exculpatory evidence that did not yet exist. *See Harden*, 799 F.3d at 864. In any event, the issue here is whether Defendant's reasons were genuine, not whether they were prudent.

[13] Plaintiff argues that there is a genuine dispute whether she was replaced by Johns or Jaramillo. But Plaintiff does not dispute that Johns temporarily assumed Plaintiffs' duties and Jaramillo eventually filled Plaintiff's position full time. Thus, the real disagreement is whether Johns's temporary assumption of duties establishes pretext. It does not. An employer's decision to "let one employee go and to divide that employee's duties among other existing employees plainly poses a much greater hurdle for a pretext argument than a decision to hire a younger person to supplant an older employee." *Hansen v. Crown Golf Properties L.P.*, 826 F. Supp. 2d 1118, 1121 (N.D. Ill. 2001). Had Defendant fired Plaintiff and permanently replaced her with the much younger Johns, perhaps an inference of age-based discrimination would arise. But the eventual hiring of Jaramillo, who was older than Plaintiff, dispels any inference of discrimination because it is inconsistent with Defendant's alleged intention to terminate older employees like Plaintiff.

hired, a younger employee "pitching in to cover the [terminated employee's] duties—along with several others—while [the employer] searched for a replacement is not evidence" of age discrimination. *Daza v. State*, 331 F. Supp. 3d 810, 846 (S.D. Ind. 2018).

Plaintiff's contention that Jaramillo was placed at Tinley West by Defendant to "buttress its pretextual reasons for terminating Plaintiff" is unsupported and unreasonable speculation. (Dkt. 69 at 8–9.) Jaramillo testified that he left Tinley West after two months because there was a new opening at Defendant's Lutheran General Hospital, which "is very close to my house" and "very convenient for me to move and take this new position." (Dkt. 70-7 at 8.) Jaramillo left Tinley West for personal convenience, and there is no support in the record for Plaintiff's contention that Jaramillo's hiring was planned by Defendant as cover for the eventual hiring of the substantially younger Sarah Rizzo.[14]

After examining all of Plaintiff's supposed evidence of pretext, the Court finds that no reasonable factfinder could conclude that Defendant terminated Plaintiff because of her age.[15] Accordingly, Plaintiff's ADEA claim fails, and Defendant is

---

[14] In her response to Defendant's motion for summary judgment, Plaintiff also argues that there is a genuine dispute regarding whether Sarah Rizzo replaced Jaramillo. But Plaintiff's statement of additional facts asserts that Rizzo was hired to fill Jaramillo's position after he left Tinley West. (Dkt. 70 ¶ 94.) There is no dispute on this fact.

[15] Plaintiff attacks Defendant's general credibility because Defendant denied in its Answer certain allegations made in Plaintiff's complaint that were ultimately proven true after discovery. But Defendant's Answer, which was filed almost a year after Plaintiff's discharge, is irrelevant to Marczali and Pierce's state of mind when they decided to terminate Plaintiff. *See Harris v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 2016 WL 1086515, at *4 (N.D. Ill. Mar. 21, 2016) (Defendants' failure to admit certain allegations in their Answers "does not suggest that Defendants' proffered reason for their pre-litigation decision to suspend Plaintiff was pretextual.").

entitled to summary judgment.

## IV.    CONCLUSION

Defendant's motion for summary judgment (Dkt. 57) is granted.

SO ORDERED in No. 19-cv-06071.

Date: June 16, 2023

_____
JOHN F. KNESS
United States District Judge